IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
July 16, 2024 Session

**STATE OF TENNESSEE v. CURTIS W. BRADLEY**

**Appeal from the Criminal Court for Davidson County**
**No. 2023-A-37      Angelita Blackshear Dalton, Judge**

_____

**No. M2023-01542-CCA-R3-CD**
_____

Defendant, Curtis Bradley, was indicted on one count of aggravated assault by causing serious bodily injury and one count of false imprisonment. He entered a negotiated plea agreement to the lesser-included charge of reckless aggravated assault with the trial court to determine the length of sentence and whether Defendant would receive judicial diversion. The false imprisonment charge was dismissed pursuant to the agreement. The trial court denied judicial diversion, and ordered Defendant to serve three years, suspended to probation. Defendant argues on appeal that the trial court abused its discretion in denying his request for judicial diversion and by imposing more than the minimum sentence. Based on our review of the entire record, oral arguments, and the parties' briefs, we affirm the judgment of the trial court, but remand for entry of a judgment form for the dismissal of count two.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JILL BARTEE AYERS, J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and J. ROSS DYER, JJ., joined.

Patrick T. McNally, Nashville, Tennessee (on appeal), and Stephen G. Young, Nashville, Tennessee (at plea and sentencing), for the appellant, Curtis Bradley.

Jonathan Skrmetti, Attorney General and Reporter; Edwin Alan Groves, Jr., Assistant Attorney General; Glenn R. Funk, District Attorney General; and Simone Marshall, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## Factual and Procedural Background

On January 19, 2023, Defendant was indicted by a Davidson County Grand Jury for aggravated assault by intentionally or knowingly causing serious bodily injury to Deborah Witte, the victim (count one), and false imprisonment (count two). On August 30, 2023, Defendant pled guilty to the lesser-included offense of reckless aggravated assault, and in exchange, the State dismissed count two. Pursuant to the agreement, the trial court would decide the length of Defendant's probationary sentence, whether Defendant would serve up to thirty days of incarceration, and whether Defendant would receive judicial diversion.

At the plea hearing, the State presented the following factual basis for Defendant's plea:

> [H]ad this matter gone to trial, . . . the proof would have shown that on January 25, 2022, [the victim] contacted the domestic violence unit with the Metro Nashville Police Department about an incident that took place on July the 4th of 2021. She explained that at approximately 1:00 a.m., she returned to the Hilton Garden Inn . . . after going downtown.
>
> When she was walking in front of the entrance of the hotel, she observed the defendant, who at the time was her intimate partner, waiting for her. He was upset because he thought that she was downtown with other individuals, and a verbal argument ensued. She stated that at one point during the argument, he pushed her and she fell to the ground.
>
> Security for the hotel separated the parties, and they eventually went back to their room. In the room, there were also reports of an incident that occurred there. The witness, Lewis Brown, works for security for the hotel and told officers he was working the night of the incident. He heard yelling coming from outside, and when he went outside, the victim was on the ground, and the defendant was trying to help her up.
>
> Mr. Brown separated the parties for a little while until they returned to their hotel room, where a noise complaint was filed. . . . Mr. Brown then detained the defendant until police arrived on scene. The officers arrived on scene and spoke with the victim, and she declined to make any statements about what happened.

- 2 -

Mr. Brown told the officers that the victim had advised him that the defendant had pushed her down. After [the victim] pursued medical attention, it was concluded that [the victim's] hip had been shattered as a result of the fall, and medical records were submitted to the investigators. Based on those facts that occurred here in Davidson County, the State would recommend the previously-announced disposition.

At the October 5, 2023 sentencing hearing, Defendant entered as a collective exhibit his presentence report, along with twenty-three letters of support, his statement of the offense, a civil complaint filed against him by the victim, a certification of eligibility for diversion, and certifications of completion of an online anger management course and an alcohol and drug awareness class. Defendant's validated risk and needs assessment determined that he was a "low risk" to reoffend.

The victim read her victim impact statement and exhibited photographs to her statement. She stated that she was a "strong, independent, highly-capable, accomplished [fifty-seven]-year-old businesswoman" who moved her business and cattle to the small town where Defendant then resided to be in a relationship with him. Defendant became an integral part of two of her businesses. At the time of the offense, she had been in a relationship with Defendant for approximately six years, and although Defendant displayed "insecurity and control issues" early in the relationship, the victim hoped that his "jealous" and "sometimes violent behavior would eventually go away." However, she realized too late that Defendant had entered into a "phase of higher frequency, more violent behavior."

The victim and Defendant were in Nashville to celebrate the Fourth of July holiday and Defendant's new job. The victim also planned to visit a yoga studio to pursue becoming a yoga instructor. On the night of the offense, the victim "got lost" on her way back to the hotel and when she arrived Defendant pushed her to the ground, breaking her hip. When other people gathered around, Defendant acted like he was helping her. She "couldn't make sense of what had happened" but after he helped her to the hotel room, Defendant "started at it again" about where she had been that night. She testified that she tried to escape twice, but Defendant stopped her. Finally, another hotel guest called security to their room, and Defendant left the hotel room. Later, when the victim spoke with Defendant about the incident, he "minimized what he had done" by telling the victim "it's not that bad. You can get over this. . . . . You're going to be doing yoga again in no time." Defendant blamed his behavior on alcohol, but the victim thought it was his violent nature.

As a result of the victim's broken hip from Defendant's assault, her life was "torn apart" from the decline in her physical and mental health and financial resources. Her

lawyers told her not to communicate with anyone about what happened because of the pending civil suit, so she could not "defend the lies" that were being told about her. The victim requested that the trial court order Defendant to "repay [her] at least some of [her] costs for moving, unpaid therapy, and counseling." After objection by Defendant, the State made an oral request for the trial court to consider restitution.

The victim described her hip replacement surgery as "traumatic" because she had watched her mother die from a complication after hip replacement surgery. In the months that followed the incident, the victim maintained a romantic relationship with Defendant. By October 2021, Defendant was frustrated that "every weekend when he came home to Indiana [they] were still talking about [her] hip." By November, he was "using his physicality" against her. The victim obtained a restraining order against Defendant because she wanted him to leave her apartment; when he refused, she left, and he followed her into the health club at her apartment building and used his foot to prevent her from closing the door. During her recovery, Defendant informed her that his family wanted to rent the farmhouse in which she lived with Defendant because Defendant had a new job in Kentucky. The victim had a limited time to move out while she was recovering. She moved seven times between 2021 and 2023 until she found a stable location to live and closed down her "now-failed" Indiana office. The victim finally ended the relationship with Defendant because she feared that he would "break [her] other hip."

The victim explained that she experienced "so much pain associated with this injury with staples in [her] side, with the incision through [her] healthy muscles in [her] leg." She could not put more than fifteen pounds on her leg post-surgery for more than eight weeks and had to use crutches several weeks longer. The victim testified that even though the x-rays of her hip looked "perfectly fine," the ball wasn't moving well in the socket, and therapy was not working. She had constant pain in her hamstring muscles and was on pain relievers and anti-inflammatories for over a year which damaged her stomach lining, causing hospitalization for a "stomach virus." As of the date of the sentencing hearing, the victim testified that her leg had shrunk, her "pelvic balance" was off, and the leg muscles on the left side were still weaker.

Defendant testified that he worked at Warner Fertilizer Company as a general manager. In that role, he oversaw eleven locations and approximately eighty-five employees. Defendant explained that he lived "paycheck to paycheck" and paid for half of his daughter's medical and college expenses.

Defendant testified that his hearing impairment made it "very challenging" to be on Broadway with the victim on July 4, 2021, because it was "very chaotic." They were both inebriated, and Defendant believed that an unknown man, who had been purchasing

whiskey shots for him and the victim, had "spiked" his drink. After he and the victim finished their dinner, Defendant assisted the unknown man in ordering an Uber and then went to the location where he was to meet with the victim, but the victim was not there. Defendant was "scared" because he could not contact the victim as she had left her cell phone at the hotel. He was unable to locate the victim and returned to their hotel to wait for her.

The victim arrived at the hotel approximately one hour later, and she approached him at a "fast pace," and he "kind of pushed back, and that's when she went over." Defendant did not know that the victim had broken a bone, so he helped her off the ground and used a hotel cart to move the victim upstairs. Once upstairs, Defendant looked for his car keys and became "frustrated" because he thought the victim had taken the keys so he "tossed a [cologne] bottle over her way" while looking for his keys in his suitcase. Police arrived and told Defendant that he should leave, but he was not arrested that night. Defendant was arrested in Kentucky "[s]everal months" after the incident and felt like he was "kidnapped." In the months between the incident and his arrest, Defendant and the victim maintained a "very loving relationship," and he helped her during her surgery and recovery, including paying for her medical bills. Defendant "gave [the victim] a credit card that . . . she could use . . . to go to get her therapy done." Defendant described his two weeks in a Kentucky detention facility as "extremely hard and painful" because he did not expect to be arrested and his employment was in jeopardy. Defendant was "extremely sorry" that this "heartbreaking and terrible thing happened" and asked the trial court to impose probation. Defendant stated that it was "extremely important" to him that the trial court allow the charge to be expunged because he wanted to be able to vote, possess firearms, and remain employed.

On cross-examination, Defendant explained that he accidentally still had the unknown man's cell phone after he helped the man order an Uber. When Defendant answered a call on the man's cell phone the next morning, the man "admitted that he put something" in Defendant's drink. Defendant maintained that he "tossed" the cologne bottle toward the victim but did not throw it. He admitted that both his and the victim's voices were raised and that he knocked over a lamp in the hotel room but denied that the hotel room was messed up. Defendant acknowledged that he answered a phone call from the victim while there was an order of protection against him but testified that he did not understand "what an order of protection even really meant." Upon further questioning by the trial court, Defendant agreed that he attended a court hearing for the order of protection, but later stated that he "did not go before a judge that explained to [him] what was going on[.]"

After hearing arguments from the parties, the trial court stated that it would further consider restitution and inform the parties whether there would be additional proof. The

trial court first considered the length of the sentence finding no applicable mitigating factors and giving "very minimal weight" to enhancement factor one, that Defendant had a history of criminal behavior based on the violation of the order of protection, *see* T.C.A. § 40-35-114(1), and sentenced Defendant to three years, suspended to probation noting that Defendant had served two weeks of incarceration in Kentucky.

In determining whether to grant judicial diversion, the trial court noted that it is "guided by" the factors in *State v. Parker*, 932 S.W.3d 945 (Tenn. 1996), and addressed the factors noting that there was no evidence presented indicating that Defendant was not amenable to correction, "so I don't think that factor weighs against him." The trial court then stated that Defendant's lack of a criminal record did not weigh against him. The trial court found that Defendant's social history weighed favorably toward granting diversion based on the number of letters presented in his support. The court did not "really glean from what's been presented anything with regard to [Defendant's] physical or mental health that would make this applicable," so the court then turned to the circumstances of the offense and the deterrence value to the accused and others noting that those factors were strongly considered in the court's determination of whether to grant judicial diversion "in this particular case." The trial court expressed concern with Defendant's "level of minimizing his very own conduct[,]" specifically noting that:

> [Defendant] has stated how this being a permanent conviction on his record is going to . . . have such a long-lasting impact on his life and, yes, it does. It does. I get that. But the [c]ourt cannot overlook the lasting impact that his conduct has had on [the victim's] life.

> [The offense] occurred in . . . 2021, and in 2023, [the victim] is still experiencing the physical impact of [Defendant's] conduct. To this day, she is still experiencing the financial decline as a result of this, so this, too, has had a lasting impact on her.

The trial court further expressed its difficulty in accepting Defendant's explanation for his violation of the order of protection and then found that considering the "circumstances of the offense and the deterrence value, that they weigh against granting diversion, so this will be a permanent conviction on [Defendant's] record." In addition to the three-year suspended sentence, the trial court ordered Defendant to complete a twenty-six week batterers' intervention program and to have no contact with the victim. The judgment for count one was entered on October 5, 2023, noting that "further information regarding restitution to be given by court."

After the sentencing hearing, Defendant filed a "Motion to Reconsider Sentencing Hearing Ruling," with a notarized affidavit from Defendant attached. In the affidavit,

Defendant explained that his employment required security clearance from the Department of Homeland Security and that he was the vice president, and set to become president, of the Agribusiness Association of Kentucky, which worked with the Kentucky legislature. Defendant would not be able to retain either of those roles "[i]f this criminal charge [was] entered as judgment of guilt instead of a conditional finding of guilt with the possibility of expungement[.]" On November 13, 2023, the trial court denied the State's request for restitution based on the fact that restitution was not a part of the negotiated plea agreement. The trial court also denied Defendant's motion to reconsider, noting that it was "not unsympathetic to the impact of criminal convictions as it relates to employment" but stood by its "finding in denying judicial diversion in this case." An amended judgment was entered that reflected the denial of restitution on November 15, 2023.

Defendant's timely appeal is now properly before this court.

**Analysis**

I.     Judicial Diversion

Defendant argues that the trial court erred in denying his request for judicial diversion by failing to properly weigh all requisite factors and by relying on an improper factor, and thus this court should conduct a de novo review of the denial of judicial diversion. Defendant also contends that the trial court erred by sentencing Defendant to more than the minimum sentence of two years. The State argues that the trial court's denial of judicial diversion is entitled to the presumption of reasonableness because the trial court properly weighed the *Electroplating* factors, and alternatively, under a de novo review, the record supports a denial of diversion. We agree with the State that the trial court's denial is entitled to the presumption of reasonableness.

Following a determination of guilt by plea or by trial, a trial court may, in its discretion, defer further proceedings and place a qualified defendant on probation without entering a judgment of guilt. T.C.A. § 40-35-313(a)(1)(A); *State v. Dycus*, 456 S.W.3d 918, 925 (Tenn. 2015). If the defendant successfully completes the period of probation, the trial court is required to dismiss the proceedings against him, and the defendant may have the records of the proceedings expunged. T.C.A. § 40-35-313(a)(2), (b); *Dycus*, 456 S.W.3d at 925.

As an offender convicted of reckless aggravated assault, a Class D felony, and with no prior criminal record, Defendant met the statutory requirements to be considered for judicial diversion. *See* T.C.A. § 40-35-313(a)(1)(B). Mere eligibility, however, does not entitle a defendant to judicial diversion. *State v. Parker*, 932 S.W.2d 945, 958 (Tenn.

Crim. App. 1996). Instead, the decision to grant or deny a qualified defendant judicial diversion "is entrusted to the trial court." *State v. King*, 432 S.W.3d 316, 326 (Tenn. 2014) (citation omitted). In determining whether to grant diversion, the trial court must consider the following factors: (a) the accused's amenability to correction, (b) the circumstances of the offense, (c) the accused's criminal record, (d) the accused's social history, (e) the accused's physical and mental health, (f) the deterrence value to the accused as well as others, and (g) whether judicial diversion will serve the interests of the public as well as the accused. *State v. Electroplating, Inc.*, 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998).

In *King*, our supreme court held that *State v. Bise*, 380 S.W.3d 682 (Tenn. 2012), did not abrogate the *Electroplating* factors. Specifically:

> Under the *Bise* standard of review, when the trial court considers the *Parker* and *Electroplating* factors, specifically identifies the relevant factors, and places on the record its reasons for granting or denying judicial diversion, the appellate court must apply a presumption of reasonableness and uphold the grant or denial so long as there is any substantial evidence to support the trial court's decision. Although the trial court is not required to recite all of the *Parker* and *Electroplating* factors when justifying its decision on the record in order to obtain the presumption of reasonableness, the record should reflect that the trial court considered the *Parker* and *Electroplating* factors in rendering its decision and that it identified the specific factors applicable to the case before it. Thereafter, the trial court may proceed to solely address the relevant factors.

*King*, 432 S.W.3d at 327 (footnote omitted).

First, Defendant complains about how the trial court phrased its weighing of the factors when it stated that Defendant's amenability to correction and lack of criminal record did not "weigh[] against him," rather than stating that those factors weigh favorably toward granting diversion. When taken in context, it is clear that the trial court weighed the factors favorably for Defendant, even if the trial court did not specifically state such. *See King*, 432 S.W.3d at 324 n.8 ("The trial court, however, is not required to utilize any 'magic words' or specifically reference the case names '*Parker*' or '*Electroplating*' when discussing the relevant factors in order to receive the presumption of correctness.").

Next, Defendant argues that the trial court "passed on consideration of [Defendant's] good physical and mental health despite no evidence of any ill health." However, the record reflects that the trial court considered Defendant's health, but "did

not glean from what's been presented anything with regard to his physical or mental health" essentially finding the factor neutral. *See State v. Fucci*, No. M2022-01425-CCA-R3-CD, 2023 WL 6785862, at *6 (noting that a defendant's health "may weigh neutrally where no physical or mental health condition prevents the defendant from complying" with diversion) (Tenn. Crim. App. Oct. 13, 2023), *no perm. app. filed*; *King*, 432 S.W.3d at 328 (weighing as neutral the defendant's physical and mental health because the record reflected "nothing remarkable" regarding this factor).

Defendant argues that there was no discussion of whether judicial diversion would serve the interests of Defendant and the public. However, the trial court did note that a permanent conviction would have a long-lasting impact on Defendant's life, but she weighed that against the impact his conduct had on the victim's life. Further, a trial court is not required to specifically state its consideration of each factor so long as the record reflects that the trial court identified and weighed the factors that are appropriate. *Dycus*, 456 S.W.3d at 930. Diversion may serve the interests of a defendant when a permanent conviction would impair future employment or when necessary to avoid the stigma of a felony conviction. *State v. Sheets*, No. M2022-00538-CCA-R3-CD, 2023 WL 2908652, at *12 (Tenn. Crim. App. Apr. 12, 2023) (citations omitted), *no perm. app. filed*. However, diversion does not serve the interests of the public if diversion would depreciate the seriousness of the offense. *Id.* This court has previously "considered the nature of the victim's injuries in this category[.]" *Id.* (citing *State v. White*, No. M2021-00118-CCA-R3-CD, 2022 WL 570136, at *5 (Tenn. Crim. App. Feb. 25, 2022)), *no perm. app. filed*. Additionally, in denying Defendant's motion to reconsider the sentence, the trial court implicitly weighed the impact on Defendant's interest in future employment against the interests of the public and determined that this factor weighed against granting diversion. The record reflects that the trial court considered each factor for diversion, and while it did not analyze each factor in great detail, it did explain its reasoning for denying diversion. *See State v. Moore*, No. E2014-01790-CCA-R3-CD, 2015 WL 4314107, at *4 (Tenn. Crim. App. July 15, 2015); *State v. Adinolfi*, No. E2013-01286-CCA-R3-CD, 2014 WL 2532335, at *4 (Tenn. Crim. App. June 2, 2014).

Finally, Defendant asserts that in denying diversion, the trial court placed undue weight on an improper factor, the impact on the victim, in its consideration of the circumstances of the offense. Defendant relies on *State v. Mehdi*, No. W2020-00021-CCA-R3-CD, 2021 WL 1832145 (Tenn. Crim. App. May 7, 2021), *no perm. app. filed*, and *State v. Wells*, No. M2022-01561-CCA-R3-CD, 2023 WL 8437067 (Tenn. Crim. App. Dec. 5, 2023), *no perm. app. filed*. In *Mehdi*, this court reversed and remanded the trial court's denial of diversion because the trial court considered only two of the *Electroplating* factors, and instead relied on its "displeasure" with the crime of sexual battery, the financial and psychological impact on the victim, and the victim's feelings regarding diversion. *Mehdi*, 2021 WL 1832145, at *5. This court held that "the trial

court considered at least one irrelevant factor that tainted the court's decision-making process such that the presumption of reasonableness is not appropriate." *Id.* In *Wells*, this court conducted a de novo review after finding that the presumption of reasonableness was not appropriate because the trial court's "ruling was merely a recitation" of the *Electroplating* factors and the trial court placed undue emphasis on the defendant's offensive Facebook post, which was not a diversion factor. *Wells*, 2023 WL 8437067, at *11.[1]

This court has previously held that a victim's injuries may be considered, but the general impact on the victim and the victim's feelings on diversion are not proper considerations. *See Sheets*, 2023 WL 2908652, at *12 (stating that consideration of the victim's injuries is proper); *Mehdi*, 2021 WL 1832145, at *5 (holding that the non-physical impact on the victim and the victim's feelings on diversion were irrelevant to whether to impose diversion). In this case, however, we cannot conclude that the trial court placed "undue emphasis" on the impact on the victim. *See State v. Baron*, No. E2019-02062-CCA-R3-CD, 2020 WL 6689979, at *4 (Tenn. Crim. App. Nov. 13, 2020) ("However, a court's mere consideration of an irrelevant factor does not result in an abuse of discretion because 'it is the undue consideration of an irrelevant factor that is prohibited.'") (quoting *Stanton v. State*, 395 S.W.3d 676, 687 n.2 (Tenn. 2013)). Unlike in *Mehdi* and *Wells*, the trial court's comments regarding the long-term impact on the victim were in addition to its consideration of the other *Electroplating* factors and were made in weighing the impact of diversion on Defendant and the victim.

Similarly, we conclude that the trial court properly considered Defendant's violation of the order of protection in weighing whether granting diversion would serve as proper deterrence. Defendant admitted that he violated the order of protection but asserted that he did not know answering a phone call would violate the order. The trial court made a credibility finding, noting that it had a "difficult time" accepting Defendant's explanation and thought Defendant "tried to explain it away."

For the foregoing reasons, we afford the trial court's denial of diversion a presumption of reasonableness and assess whether there was substantial evidence in the record to support that decision. "'Substantial evidence' is '[e]vidence that a reasonable mind could accept as adequate to support a conclusion; evidence beyond a scintilla.'" *State v. Clark*, 452 S.W.3d 268, 280 (Tenn. 2014) (quoting BLACK'S LAW DICTIONARY 640 (9th ed. 2009)). After reviewing the diversion factors, the trial court found that the circumstances of the offense and the need for specific deterrence outweighed favorable or

---

[1] We note that during oral argument, the State asked this court to clarify whether consideration of the impact on the victim is not only permissible, but required, under our sentencing statutes. However, a party may not raise an issue for the first time at oral argument. *State v. Henry*, 539 S.W.3d 223 (Tenn. Crim. App. 2017) (citing Tenn. R. App. P. 36(a)).

- 10 -

neutral factors and denied diversion. Regarding the circumstances of the offense, the record reflects that Defendant was charged with aggravated assault and false imprisonment, but he pled guilty to a lesser-included offense of reckless aggravated assault. *See State v. Bowman*, No. E2011-01906-CCA-R3-CD, 2012 WL 3264481, at *2-3 (Tenn. Crim. App. Aug. 13, 2012) (considering leniency in plea agreement as substantial evidence in support of the trial court's denial of diversion even though the trial court did not state such in its reasoning). The record also sufficiently supports the trial court's determination that there was a need for specific deterrence based on Defendant's continued aggression toward the victim that led to the victim's obtaining an order of protection against Defendant, which Defendant admitted to violating. Defendant maintained that he did not understand that he would violate the order by answering the victim's phone call but was contradictory regarding whether he was advised by a court as to what was prohibited by an order of protection. Additionally, Defendant minimized his conduct and the victim's injuries after the offense and throughout sentencing. The trial court did not abuse its discretion when it denied diversion. Defendant is not entitled to relief.

## II.   Length of Sentence

Defendant argues that the trial court abused its discretion when it did not clarify its reasoning for imposing a sentence above the minimum, that the sentence is not supported by the record, and that the sentence is inconsistent with the purposes and principles of the Sentencing Act. The State responds that because the within-range sentence complies with the purposes and principles of sentencing, the trial court did not abuse its discretion.

On appeal, the party challenging the sentence bears the burden of establishing that the sentence is improper. *State v. Branham*, 501 S.W.3d 577, 595 (Tenn. Crim. App. 2016). This court will uphold a sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. A trial court must consider the evidence presented at the sentencing hearing, the presentence report, the principles of sentencing and any sentencing alternatives, the nature and characteristics of the criminal conduct involved, any applicable mitigating and enhancement factors, statistical information provided by the administrative office of the courts regarding sentencing practices for similar offenses, the defendant's statement, and the validated risks and needs assessment. T.C.A. § 40-35-210(a), (b). Additionally, the sentence imposed should be "no greater than that deserved for the offense committed" and "the least severe measure necessary to achieve the purposes for which the sentence was imposed." *Id.* § 40-35-103(2), (4).

When adjusting the length of a sentence within the appropriate range, a trial court is guided by, but not bound by, any mitigating and enhancement factors, and "misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Sentencing Act, as amended in 2005." *State v. Mosley*, No. W2022-01424-CCA-R3-CD, 2024 WL 1406156, at *21 (Tenn. Crim. App. Apr. 2, 2024) (quoting *Bise*, 380 S.W.3d at 706), *no perm. app. filed*; *see* T.C.A. § 40-35-114. Trial courts are "required under the 2005 amendments to 'place on the record, either orally or in writing, what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing.'" *Bise*, 380 S.W.3d at 698-99 (quoting T.C.A. § 40-35-210(e) (2010)). A trial court may impose the maximum within-range sentence "even if no statutory enhancement factors are applicable, as long as the sentence is within the correct range and the sentence complies with other sentencing purposes and principles." *State v. Nichols*, No. W2014-02276-CCA-R3-CD, 2016 WL 3389987, at *5 (Tenn. Crim. App. June 10, 2016); s*ee State v. Rollins*, No. E2022-00890-CCA-R3-CD, 2023 WL 4078700, at *5 (Tenn. Crim. App. June 20, 2023) ("The application of a single enhancement factor can justify an enhanced sentence."), *perm. app. denied* (Tenn. Oct. 13, 2023).

In this case, Defendant faced a range of two to four years as a Range I, standard offender for his Class D felony reckless aggravated assault conviction. The trial court imposed a mid-range sentence of three years. The record reflects that the trial court considered the enhancement and mitigating factors, found no applicable mitigating factors, and gave "very minimal weight" to one enhancement factor, that Defendant's violation of the order of protection reflected a previous history of criminal behavior. *See* T.C.A. § 40-35-114(1); *State v. Carico*, 968 S.W.2d 280, 288 (Tenn. 1998) (upholding application of enhancement factor one based on criminal behavior that was not a conviction).

Defendant argues that the trial court erred by failing to explain why it did not apply any of the mitigating factors listed in Tennessee Code Annotated § 40-35-113. While Defendant is correct that the trial court failed to explain why it did not apply any mitigating factors despite evidence that Defendant had completed rehabilitative courses, had no criminal record, and was deemed low risk to reoffend, a trial court's misapplication of the advisory mitigating factors does not invalidate the sentence. *See State v. Craft*, No. W2022-01720-CCA-R3-CD, 2024 WL 890191, at *9 (Tenn. Crim. App. Mar. 1, 2024) (refusing to invalidate the defendant's sentence even where this court agreed "that the proof supported the application of [a] mitigating factor" and "the trial court failed to specifically address" why other mitigating factors did not apply), *no perm. app. filed*.

Defendant further asserts that the sentence does not comply with the purposes and principles of sentencing because the trial court did not consider Defendant's potential for rehabilitation. While the trial court did not explicitly state its consideration of Defendant's potential for rehabilitation, the trial court noted its concern with Defendant's violation of the order of protection. Additionally, the trial court implicitly considered Defendant's potential for rehabilitation when it declined to impose any additional incarceration. The trial court did not abuse its discretion in imposing a mid-range probationary sentence that complied with the purposes and principles of the sentencing act. Defendant is not entitled to relief.

## CONCLUSION

We affirm the judgments of the trial court. However, we note that there is not a judgment form in the record reflecting the dismissal of count two. A trial court must enter a judgment "[i]f the defendant is found not guilty or for any other reason is entitled to be discharged." Tenn. R. Crim. P. 32(e)(3); *State v. Campbell*, No. W2022-01039-CCA-R3-CD, 2023 WL 2968225, at *3 (Tenn. Crim. App. Apr. 17, 2023), *no perm. app. filed*. Therefore, we remand for entry of a judgment form reflecting the dismissal of count two.

_____
JILL BARTEE AYERS, JUDGE

- 13 -